IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. NICOLE ATTOCKNIE, Personal Representative of Estate of Aaron Scott Palmer, et al., <br><br> Plaintiff, <br><br> v. <br><br> 1. SHANNON SMITH, individually and in his official capacity as Sheriff of Seminole County, Oklahoma; et al., <br><br> Defendants. | Case No.  CIV 13-158-FHS |

## DEFENDANT KENNETH CHERRY'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Comes now the Defendant, Kenneth Cherry ("Cherry") and moves for judgment in his favor as there is no dispute as to any material fact pursuant to Fed. R. Civ. P. 56.  In support hereof Cherry respectfully shows as follows:

Plaintiff is suing Defendant Cherry in his individual capacity for violation of the Fourth Amendment via 42 U.S.C. § 1983, the Oklahoma State Constitution for identical claims, and state tort claims of assault and battery and possibly negligence although it is difficult to ferret out that particular cause.  Cherry denies that there is any genuine issue as to any material fact on any of those claims and that he is entitled to judgment as a matter of law.

This case arises from the attempted arrest of fugitive Randell Palmer, and the unfortunate, but justifiable, shooting of Aaron Palmer by Officer Cherry in pursuit of Randell Palmer on August 25, 2012.  Cherry contends that he was within the scope and

course of his employment as the Seminole County Drug Court Compliance Officer at the time of the subject events and was lawfully in pursuit of Randell Palmer when he encountered Aaron Plamer with a large butcher knife upon entering the residence where Randell Plamer was believed to be located.

### Statement of Undisputed Facts:

1. It is undisputed that Cherry was attempting to serve a warrant for the arrest of Randell Palmer on August 25th, 2012. (Ex. 1, Plaintiff's Second Amended Complaint, at ¶¶. 21 and 22; and Ex. 8, Bench Warrant for arrest of Randell Palmer).

2. It is undisputed that Cherry upon entering the residence at of Aaron Palmer and Nicole Attocknie that he was met near the doorway entrance by Aaron Palmer who had a large knife in his hand. (Ex. 1, Plaintiff's Second Amended Complaint, at ¶. 35; Ex. 2, Deposition of Cherry, at p. 102).

3. Prior to attempting to serve the warrant for Randell Palmer, Cherry had seen him standing in the garage of the Killingsworth address. (Ex. 1, Plaintiff's Second Amended Complaint, at ¶. 27; Ex. 2, Cherry at p. 56, lines 18 – 25).

4. It is undisputed that Randell had been at the Killingsworth address earlier in the day. (Ex. 3, Deposition of Damien Ruiz, pp. 68 – 83, p.146 and p. 150).

5. It is undisputed that Randell Palmer had choked by the neck, and thrown sixteen year old Damien Ruiz earlier in the same day at that residence after Ruiz laughed at him for tripping over a chair in the garage. Ruiz lived at the house with Aaron Palmer and Nicole Attocknie. (Ex. 3, Ruiz, pp. 68 -73).

6. After seeing Randell Palmer standing in the garage, but prior to attempting to take him into custody, Cherry called Seminole Police Department to enlist other law enforcement officers to aid him in serving the warrant. (Ex. 1, Plaintiff's Second Amended Complaint, at ¶. 29; Ex. 2, Cherry, at p. 56, lines 24 – p. 57, line 1).

7. After making a tactical plan, Seminole officers accompanied him back to the Killinsworth residence. (Ex. 2, Cherry, pp. 58 – 61).

8. As Cherry arrives at the location, he sees and individual, who he believes to be Randell, run thru the garage and into the house. (Ex. 1, Plaintiff's Second Amended Complaint, at ¶. 31; Ex. 2, Cherry, p. 61, lines 1 – 13, and p. 102, lines 15 - 19).

9. Upon arrival, and as other officers took up position around the residence, Cherry exits his vehicle in pursuit of Randell Palmer and proceeds to the open, "ajar" entry door. (Ex. 2, Cherry, p. 66, lines 1 – 12; pp. 112 – 115; p. 116, line 5; and p. 128 lines 6 - 10).

10. Cherry was announcing himself as he approached the house and during entry. (Ex. 2, Cherry, p. 61, lines 12 – 13; p. 67, lines 6 – 10; and p. 102, lines 22 -23).

11. Upon approaching the front door, Cherry has to go around a large pit bull chained and barking in front of the house. (Ex. 2, Cherry, p. 61, lines 9- 10, lines 16 – 20; p. 63; and p. 102, lines 19 - 23).

12. Cherry had been warned by individuals that Randell Palmer was dangerous and possibly armed. (Ex. 2, Cherry, p. 121, lines 2 – 5).

13. Upon entry Cherry is confronted immediately by Aaron holding the knife in an upraised position which Cherry perceived as aggressive and an immediate threat. (Ex. 2,

Cherry, p. 102, lines 23 – 25; p. 128 lines 14 – 25 thru p. 129, lines 1 – 2; p. 130, lines 14 – 22; p. 137 lines 15 – 21; p. 138, lines 3 - 9).

14. Cherry estimates that the distance between him and Aaron Palmer was four (4) feet or less from him when he opened fire, and moving towards him. (Ex. 2, Cherry, p. 141, lines 21 – 25 thru p. 142, lines 1 – 10).

15. Cherry opens fire with one round hitting Aaron Palmer in the chest. (Ex. 1, Plaintiff's Second Amended Complaint, at ¶. 41).

16. Palmer later dies at the Shawnee Medical Center. (Ex. 1, Plaintiff's Second Amended Complaint).

17. Both Aaron Palmer and Nicole Attocknie were aware that Randell Palmer had a warrant out for his arrest. ( Exhibit. 4, Deposition of Nicole Attocknie, pp. 44 – 46).

18. Both Aaron Palmer and Nicole Attocknie knew that law enforcement officers had searched the Killingsworth address previously looking for Randell while they were living there. (Ex. 4, Attocknie, pp. 46 – 55).

19. Cherry believed that Randell resided at the Killingsworth address because he had been told that by Drug Court employees including Tammy Wall, and the previous Drug Court Compliance Officer, Joe Glasco. (Ex. 1, Plaintiff's Second Amended Complaint, at ¶. 46; Ex. 2, Cherry, p. 65, lines 6 – 10;  and p. 68, lines 13 – 25 thru p. 71).

20. Randell Palmer was wanted for arrest for his failure to comply with drug court requirements as part of his probation. (Ex. 1, Plaintiff's Second Amended Complaint, at ¶¶. 22 and 23; and Ex. 8, Bench Warrant specifying reason).

21. Fellow drug court participant, Brittany Maxwell, and friend of Randell Palmer, signed a waiver to her right to be free from searches when she entered into Seminole County Drug Court as one of the conditions. She testifies that she understands that this wiaver is effective to any residence you're in, whether it's yours or not. (Ex. 6, Deposition of Brittany Maxwell, pp. 115 – 117).

22. As part of his probation via drug court, Randell has waived his Fourth Amendment rights to search. (Ex. 9, Seminole County Drug Court Performance Contract, ¶ 34 and Ex. 10, Seminole County Drug Court Program, Notice of Responsibilities and Rights, ¶ 8).

23. Randal Palmer posed such an unpleasant and unwanted aspect of their lives, that Aaron Palmer and Nicole Attocknie were packing and planning on moving to a undisclosed location to get away from Randell. (Ex. 4, Attocknie, pp. 52 – 55; and pp. 58 – 60).

24. Nicole Attocknie was concerned that Randell had a warrant for his arrest, and yet finds out from Aaron that he was coming to her house while she was at work and taking showers, eating food and taking toiletry items from the house. (Ex. 4, Attocknie, pp. 57 – 60 and pp. 65 – 66).

25. Nicole Attocknie was aware that Aaron feared his father, Randell, because he had physically abused him and specifically beat him while in a car at a casino in 2011. (Ex. 4. Attocknie, pp. 160 – 166).

26. Nicole Attocknie and Aaron are scared of Randell and are packing to move the day after the shooting. (Ex. 4, Attocknie, pp. 166 – 170).

27. Nicole Attocknie commented to the EMT Potterfield who treated Aaron, that "they were going to move away from all this" at the hospital following Aaron's shooting. (Ex. 5, Deposition of Jimmy Poterfield, EMT, p. 86, lines 20 - 25).

28. In fact, Nicole Attocknie told Potterfield that she had personally called the [Seminole] drug court and 'the cops' to come out and get "him" although she did not specify who she meant. (Ex. 5, Poterfield, p. 86, lines 1 – 16).

29. Cherry had use of force and tactical training previously in his career as a corrections officer. (Ex. 2, Cherry, p. 134, lines 20 – 25 thru p. 136, line 4; and Ex. 11, Training record of Cherry from Corrections Corporation of America).

30. Cherry has had on duty training as a reserve officer with the City of Wewoka, Oklahoma, in the service of warrants. (Ex. 2, Cherry, pp. 67 – 68).

31. The subject shooting was reviewed and analyzed by O.R. Barris, District Attorney for the subject district with the conclusion that the shooting was a justifiable homicide in that he "…was engaged in the performance of the execution of legal process and that the circumstances of that activity created a circumstance wherein Deputy Cherry could have had a reasonable belief that the use of force applied by him was necessary to protect himself and/or other officers from serious bodily harm." (Ex. 7, Letter dated November 7th, 2012 from O.R. Barris, District Attorney to Attorney General Scott Pruitt).

## **BRIEF IN SUPPORT**

Qualified immunity acts as a defense not only from liability, but suit itself, when officers act reasonably and consistent with the constitution and civil rights even though

an injury is sustained by someone.  Also, it is clear that the defense of qualified immunity applies to all <u>federal</u> law claims.  *Crawford-El v. Britton*, 118 S.Ct. 1584 (1988).

In a remarkably similar, and recent, United States Supreme Court opinion, the court upheld a district court's ruling in favor of an officer on qualified immunity for his pursuit of a suspect where a bystander was injured by the officer.  In *Stanton v. Simms*, 134 S.Ct. 3, 187 L.Ed. 2d 341(Nov. 4, 2013) the Court reversed the Ninth Circuit Court of Appeals and reinstated the District Court's decision in favor of the pursuing officer finding that the law was not clearly established that a *warrantless* entry to a home while in hot pursuit on a misdemeanor was a Fourth Amendment violation.  There the officer was in pursuit of an individual suspected of committing a misdemeanor.  When the officer kicked open a fence gate in pursuit, he struck the eventual plaintiff, Simms, hitting her in the head and injuring her shoulder.  The Court provided that,

> [q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments and protects 'all but the plainly incompetent or those who knowingly violate the law. *Ashcroft v. al-Kidd*, 563 U.S.-----, 131 S.Ct. 2074, 2085(2011)(quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092(1986) [w]e do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'  *al-Kidd*, 563 U.S. at-------, 131 S.Ct., at 2083

Noting a sharp split among federal circuits and other authorities on officers entry into homes on a warrantless arrest while in hot pursuit, the Court determined that the pursuing officer was "not plainly incompetent" so as be protected by qualified immunity, regardless of what the Ninth Circuit thought.  At p. 5.  (cf: *Mascorro v. Billings*, 656 F.3d 1198, 1207 (10th Circuit) finding warrantless pursuit into home for arrest for a traffic

misdemeanor not justified…) (See also: *Griffin v. Wisconsin*, 483 U.S. 868 (1987), relaxing warrant and probable cause requirements for those on probation, such as Randell Plamer).

Qualified immunity is the presumption in § 1983 cases. In recent years, the Supreme Court has clarified what must be established for a Plaintiff to overcome the assertion of qualified immunity. The Plaintiff must establish (1) that there, in fact, was a constitutional violation and (2) that the law was clearly established so as to put the state official on notice that her actions constituted a constitutional violation *Kerns v. Bader*, 663 f.3d 1173, 1180 (10th Cir. 2011). This is an extremely high bar for the Plaintiff. *Id*. The Plaintiff must establish that a constitutional violation occurred and then must also establish that the constitutional rule under which the plaintiff is complaining was so clearly established that it is beyond debate *Id*.; *Ashcroft v. al–Kidd*, 563 U.S. ——, 131 S.Ct. 2074, 2080, 2083, 179 L.Ed.2d 1149 (2011). If people can disagree on a constitutional rule or on its application to a particular set of facts, then it is not beyond all debate and qualified immunity must remain intact. *Id*; *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). See also: *Cordova v. Aragon*, 569 F.3d 1183, 1189-93 (if it is not an "easy" question, then qualified immunity attaches). One way to establish that a constitutional rule is clearly established is to point to a Supreme Court case on point or on such a wealth of case law from circuit courts that no reasonable state official could debate the existence of the constitutional rule and its application to a set of facts. *Reichie v. Howards*, 132 S.Ct. 2088, 2093 (2012). However, one Supreme Court case which can be distinguished from the case under consideration, or points of law

over which circuits are split, do not create clearly established law. *Id*. (finding that two decisions from the Tenth Circuit did not create "clearly established" law, particularly since one decision rested on an abrogated case). See also: *Stanton v. Simms* 134 S.Ct. 3, 4-7 (2013).

In *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed. 2d 523 (1987), the Court stressed that caution must be used to avoid establishing a rule of law at a level of broad generality. The Court stated that the right alleged to have been violated must have been clearly established in a more "particularized, and hence more relevant, sense." 107 S.Ct. at 3039. In explaining this more "particularized sense," the Court said

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violated that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful…in light of preexisting law, the unlawfulness must be apparent….

In the *Pierce v. Gilchrist*, 359 F.3d 1279, (2004) case, the Tenth Circuit relied upon the two step inquiry from *Saucier v. Katz*, 533 U. S. 194 (2001). However, the Supreme Court entered a decision on January 21, 2009, in the case of *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565(2009)(Slip opinion, 07-751), which gave much greater flexibility to the Court in analyzing qualified immunity defenses than provided in *Saucier, Id.*

In the *Pearson* case, the Court acknowledged the inflexibility of the two step process *Saucier, i.e.*, (1) has the plaintiff presented sufficient facts to make out a violation of the constitution; and (2) was the unconstitutionality of the officers' conduct clearly

established.  The Court specifically requested the parties to address whether the mandatory procedures from *Saucier* should be maintained, or even overruled.  At 815.

The Court noted that [t]he protection of qualified immunity applies regardless of whether the government officials error is "a mistake of law, a mistake of fact, or mistake based on mixed questions of law and fact." *citing Groh v. Ramirez*, 540 U.S. 551, 567 (2004).  The Court essentially concluded that "rigid adherence" to the *Saucier* rule is confusing, causes problems and creates difficulties in review of unclear constitutional concepts.  The Court said that judges should "be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand..." (at p. 818)

A review of the *Pearson* case facts help to understand the defense.  Members of a Utah narcotics task force searched an individual's house for illegal drugs without a warrant or consent.  Their only arguable "consent" was that given to a drug purchasing informant who entered the house with permission of the owner.  The officers searched the house upon a signal from the informant and found drugs and paraphernalia.  The federal district court in Utah, where the case arose, granted the officers qualified immunity. However, the Tenth Circuit reversed on the basis that a warrantless and non-consensual search was per se unreasonable pursuant to the Fourth Amendment.

On cert, the U.S. Supreme Court reversed, finding that the officers were in fact entitled to qualified immunity based on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time…" citing

*Wilson v. Lane*, 526 U.S. 603, 614 (1999). The Court relied upon a "consent once removed" doctrine that was followed at that time in lower federal courts.

The court found that "[t]he principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson et al. v. Callahan*, 129 S.Ct. 808 (2009). "[I]f judges ... disagree on a constitutional question, it is unfair to subject [state officials] to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U. S. 603, 618 (1999).

Whether a statutory or constitutional right was clearly established at the time of the official's conduct is "an 'essentially legal question.'" *Crawford–El v. Britton*, 523 U.S. 574, 588 (1998) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526–29 (1985). It is not enough simply to allege the violation of a clearly established but conceptually broad right, such as the right to free speech, or the right to substantive due process. See *Ashcroft v. al-Kidd*, id., ("We have repeatedly told courts ... not to define clearly established law at a high level of generality.") (citations omitted). Rather, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640; see *al-Kidd*, ––– U.S. –––, 131 S.Ct. at 2083 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). "Reasonable knowledge of the law means ... knowledge of present constitutional law [and] involves knowledge only of legal rules that were 'clearly established' at the time of the conduct at issue."

*Harris v. District of Columbia*, 932 F.2d 10, 13 (D.C.Cir.1991) (citation omitted). Thus, "[w]hen properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" "*al- Kidd*, 131 S.Ct. at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In the context of excessive force cases, the U.S. Supreme Court has acknowledged that such cases fall into a "…hazy border between excessive force and acceptable force…" *Brosseau v. Haugen*, 543 U.S. 194, at 201; 125 S.Ct. 596 160 L.Ed. 2d 583 (2004). In Brosseau, an officer shot and severly wounded a burglary suspect with an outstanding warrant, in the process of attempting to elude the officer. Unlike the present case, where Aaron Palmer was armed with a knife in the immediate proximity of Defendant Cherry, Plaintiff Haugen was unarmed and merely attempting to flee. Nevertheless, the Court found the officer entitiled to qualified immunity for using deadly force where he believed the suspect posed a threat to others. In the present case, Palmer posed a legitimate threat to Officer Cherry. (See also: *Garczynski v. Bradshaw,* 573 F.3d 1158 (11th Cir. 2009) determining that officers need only *arguable* probable cause, at 1167)

In *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694(1985) and *Graham v. Conner*, 490 U.S. 386, 109 S.Ct. 1865 (1989), the Supreme Court determined that excessive force cases are judged by the objective, reasonableness standard of the Fourth Amendment. Where an officer reasonably believes that an individual poses a threat he is allowed to use deadly force. Here, Cherry is met at the door that he believes he is entitled to enter and is met by an individual with an upraised 10-12 inch knife. Following the "beyond debate"

conclusion compelled by *al-Kidd*, *Id.*, qualified immunity attaches and the claims against Cherry should be denied.

For other instances of qualified immunity in regards to use of force claims, see *Becker v. Bateman*, 709 F.3d 1019 (10th Cir. 2013), where the Circuit court provided that the law was *not* clearly established in regards to the "appropriate level" of force which may be used in arresting a drunk driver, who sustained a traumatic brain injury in the police assisted takedown; and *Corder v. Denver*, 2000 WL 123846 (10th Cir. 2000) (unpublished), where qualified immunity was denied when officers removed an intoxicated individual from his vehicle and unfortunately placed him directly onto and extremely hot manhole cover. When, kicking and screaming, he complained that "…he was on fire…" he was maced in the face by an officer.

Lastly, it if important to note that once a defendant has properly raised qualified immunity, the burden shifts to the Plaintiff to satisfy the strict two part test of Saucier, id.: first that the defendant's actions violated a constitutional right and, secondly, that the right was clearly established at the time of the conduct. *Rojas v. Anderson,* 727 F.3d 1000 (10th Cir. 2013), at 1003, *cert denied*, 134 S.Ct. 800, 187 L.Ed2d 596 (Dec. 9, 2013). Then and only then, does the traditional burden go back upon the Defendant/movant to show that there is no genuine issue as to any material fact. Id. Although it is still clear that all disputed facts must be taken in the light most favorable to the non-movant. *Tolan v. Cotton*, 572 U.S. _____, (May 5th, 2014).

## Cherry Is Immune from Suit for State Tort Claims

In addition to suing Cherry for alleged violation of the civil rights of Aaron Palmer and Nicole Attocknie, the Plaintiff has loosely alleged that Cherry was also negligent, or otherwise committed an assault and battery.  However, Under the Governmental Tort Claims Act, "all employees of the State of Oklahoma and its political subdivisions while acting within the scope of their employment shall be immune from liability for torts".  51 O.S. § 152.1(A).  A state or political subdivision is liable for the torts of its employees, and the state or political subdivisions liability shall be exclusive.  51 O.S. § 153. The petition shall name the state of Oklahoma and in **no instance shall an employee of the state be named as a Defendant**.  51 O.S. §163(C).  The Oklahoma Supreme Court has explained this provision as follows:

The Legislature has provided immunity for the state employees acting within the scope of their employment.  51 O.S.2001 § 152.1(A).  This immunity relieves the state employees of private liability for tortious conduct and allows them to perform their duties and make decisions on behalf of the State free from fear of suit.  *Shephard v. CompSource Oklahoma*, 2009 OK 25, ¶20, 209 P.3d 288, 294 (2009).  The assumption of the defense of the employee is *prima facie* evidence that the employee was acting in good faith (and therefore in the scope of her employment) under the GTCA, *Id*. at 293.

Lastly, Cherry has been sued only in his individual capacity.  Nowhere does the Plaintiff make a claim against Cherry in his official capacity.  Nevertheless, out of an abundance of caution, in the event that Plaintiff attempts to construe or argue that he was sued in his official capacity, then Cherry is also exempt from liability as the State has

Eleventh Amendment Immunity as does its employees in their official capacity. It is well settled that a lawsuit against an officer of the State in his official capacity is a lawsuit against the entity. *Kentucky v. Graham*, 473 U.S. 159, 169 n. 14; and *Lopez v. LeMaster*, 172 F.3d 756(10th Cir. 1999).

Plaintiff also *reasserts* the same constitutional claims against Cherry under the State Constitution as she did in her federal claims, pursuant to *Bosh v. Cherokee County Bldg. Auth.,* 305 P.3d 994(Okla. 2013). Notwithstanding any statute of limitations or relation back issues, there is simply no reason to assume that a qualified immunity defense would not be available to a defendant on identical state constitutional claims of excessive force. To do otherwise would allow a Plaintiff to cherry pick constitutional claims supported by federal case law while at the same time depreving a defendant of a defense promulgated by the United States Supreme Court.

Wherefore, Defendant Cherry respectfully requests that the Court enter judgment in his favor on all claims as there are no genuine issues as to any material facts.

        Respectfully submitted,

        s/ Richard N. Mann
        **RICHARD N. MANN, OBA #11040**
        **WILSON D. MCGARRY, OBA #31146**
        Assistant Attorneys General
        Oklahoma Attorney General's Office
        Litigation Section
        313 N. E. 21st Street
        Oklahoma City, Oklahoma   73105
        Telephone:   (405) 522-2921
        Facsimile:    (405) 521-4518
        E-mail:        richard.mann@oag.ok.gov
                      wilson.mcgarry@oag.ok.gov
        *Attorneys for Defendant, Kenneth Cherry*

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day May 2014, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| Jack Mattingly, Sr.<br>Jack Mattingly, Jr.<br>The Mattingly Law Firm, P.C.<br>215 E. Oak<br>Seminole, OK 74818 | Jason E. Roselius<br>Tanner W. Hicks<br>The Roselius Law Firm<br>13190 N. MacArthur Blvd.<br>Oklahoma City, OK 73142 |
| Chris J. Collins<br>Philip W. Anderson<br>Jordan L. Miller<br>Collins Zorn & Wagner, P.C.<br>429 NE 50th St, Second Floor<br>Oklahoma City, OK 73105 | Lawrence R. Murphy, Jr.<br>Robinett & Murphy & Shrier<br>624 S. Boston Ave., Ste. 900<br>Tulsa, OK 74119 |
| M. Daniel Weitman<br>Dixie L. Coffey<br>Assistant Attorneys General<br>Oklahoma Attorney General's Office<br>Litigation Section<br>313 NE 21st Street<br>Oklahoma City, OK 73105 | |

s/ Richard N. Mann
Richard N. Mann