**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| 1.  NICOLE ATTOCKNIE, Personal Representative of Estate of Aaron Scott Palmer, et al., | |
| Plaintiff, | |
| v. | Case No.  CIV 13-158-FHS |
| 1.  SHANNON SMITH, individually and in his official capacity as Sheriff of Seminole County, Oklahoma; et al., | |
| Defendants. | |

**EXHIBIT 2 –**

**DEPOSITION OF KENNETH A. CHERRY**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

1. NICOLE ATTOCKNIE, Personal          )
Representative of the Estate of        )
Aaron Scott Palmer;                    )
2. NICOLE ATTOCKNIE, as mother         )
and next friend of M.P., a minor       )
child; and 3. NICOLE ATTOCKNIE,        )
individually,                          )
                                       )
            Plaintiff,                 )
                                       )
-vs-                                   )   Case No. 13-158-KEW
                                       )
1. SHANNON SMITH, Sheriff of           )
Seminole County, Oklahoma; and         )
2. KENNETH CHERRY;                     )
                                       )
            Defendants.                )

DEPOSITION OF

KENNETH A. CHERRY

TAKEN ON BEHALF OF THE PLAINTIFF

IN SEMINOLE, OKLAHOMA

ON OCTOBER 18, 2013

REPORTED BY:  TRENA K. BLOYE, CSR

Cherry, Kenneth                                          October 18, 2013

```
                                                      Page 56
 1   Well, I don't know.

 2       Q    (By Mr. Mattingly) How long have you had the

 3   Glock 45 that was used in August of last year?

 4       A    Probably had that for six months, maybe,

 5   before, possibly.

 6       Q    How many rounds did you put through that Glock?

 7       A    Several boxes.

 8       Q    Well, several means everything.  That could be

 9   two or it could be a hundred.

10       A    I don't have a definite answer for you.

11       Q    Could you narrow it down to a range?

12       A    150, 200 rounds.

13       Q    Okay.  That would be 15, 20 clips?

14       A    Possibly.

15       Q    Do you see this stack of papers here?  A lot of

16   this is the OSBI file.

17       A    Yes, sir.

18       Q    And see if you and I can agree on some basic

19   facts that happened on August 25th, 2012.  You had been

20   through the neighborhood where Killingsworth was located

21   earlier and thought you saw Randall Palmer in the

22   garage.  Correct?

23       A    Yes.

24       Q    Then you went and you gathered up some other

25   officers and you returned.
```

Page 57

1      A    Yes.

2      Q    And you drove up Killingsworth Street to Aaron

3   Palmer and Nicole Attocknie's house in the evening time

4   of August 25th.  Correct?

5      A    No, not to my knowledge.  It was Aaron -- it

6   was -- not Aaron's, but Randall Palmer's address.

7      Q    Okay.  And that's what I'm getting at.  You

8   thought that Randall Palmer lived there?

9      A    Yes.

10      Q    Okay.  And how did you -- why did you think

11   that Aaron -- I'm sorry.  I'm going to start all over.

12           You thought Randall Palmer lived at the

13   Killingsworth address where Aaron was shot.  Correct?

14      A    That's what I was told by drug court, yes.

15      Q    Okay.  Who told you that from drug court?

16      A    Tammy Wall, Janis.  She doesn't work there

17   anymore.  I don't know her last name.  They would know.

18   They would give me addresses.

19      Q    And did you -- had you talked to anybody about

20   who would be there or what you could reasonably

21   anticipate when you went there?

22      A    No, sir.

23      Q    Did you know in your mind as you drove up that

24   street on Killingsworth who would be at that house?

25      A    Not that day, no.

Cherry, Kenneth                                          October 18, 2013

Page 58

1    Q    Okay.  Did you know who the resident of that
2  house was?
3    A    No.  I didn't at that time, no.
4    Q    You know whether Aaron and Nicole stayed there?
5    A    Not at that time I didn't.
6    Q    Okay.  When you were driving up the street at
7  Killingsworth with other officers behind you, you didn't
8  know -- you hadn't heard whether Aaron Palmer and Nicole
9  Attocknie lived there.  Is that your sworn testimony
10  today?
11    A    It is.
12    Q    You had met previously with several police
13  officers, didn't you?
14    A    Yes, sir.
15    Q    You had met at a Quick Stop on Strothers Street
16  in Seminole?
17    A    Yes, sir.
18    Q    Was a tactical plan arrived at when you met
19  with those officers?
20    A    We had a briefing of what we were going to do.
21    Q    Who conducted the briefing?
22    A    Myself and another officer.  And I don't know
23  his name.  We just all agreed upon how we were going and
24  they were going to help me serve the warrant.
25    Q    The officer that helped you conduct the

Page 59

1    briefing, what agency was he with?

2        A    Seminole Police Department.

3        Q    Do you remember what he looked like?

4        A    He was either bald headed and white or he was,

5    now that I learned of, Mr. Hill.

6        Q    Okay.

7        A    So I'm not sure which one.

8        Q    David Hill is one of them.

9        A    Okay.

10       Q    There's an Eric Hayworth.  There's a Terry

11   McGinnis.  Do any of those names help clarify your

12   memory?

13       A    I remember their names.  That doesn't help

14   clarify -- my understanding, it might have been Eubanks.

15   That may not be right.

16       Q    Was there a tactical plan arrived at?

17       A    There was a plan to help me serve this warrant.

18       Q    What was the plan?

19       A    That we would go down -- my understanding was,

20   what I remember, I would lead, we would go down that

21   street.  And there would be -- my understanding at that

22   time would be two cars behind me and the others would go

23   to the back.

24       Q    Who would be two cars behind you?

25       A    Seminole Police Department would be behind me.

Cherry, Kenneth                                    October 18, 2013

Page 60

 1     Q    Who would be one car behind you?

 2     A    He dealt with that with his officer how they

 3   were going to do that.

 4     Q    Who is "he"?

 5     A    The one that I can't think of the name.

 6     Q    Can you describe what he looked like?

 7     A    Bald headed, white.  He was in his car.  We

 8   were all standing around his car.

 9     Q    What's his --

10     A    I'm thinking it was Eubanks.  For some reason

11   I'm thinking it was, but I may be wrong.

12     Q    What's his build?

13     A    Stocky.

14     Q    Approximate age?

15     A    Early 30s, 26 to 30.

16     Q    Okay.  So they were going to follow you.  Is

17   that the extent of the tactical plan?

18     A    Basically.

19     Q    As you were driving up the street what were you

20   going to do?

21     A    Enter the premises to find Randall Palmer,

22   because he had been seen there.

23     Q    And how were you going to enter the premises?

24     A    When I drove up -- initially was going to enter

25   through the front door.

Cherry, Kenneth                                        October 18, 2013

Page 61

1      Q    How?

2      A    By knocking on the door and going in.

3      Q    Okay.

4      A    That didn't happen.

5      Q    Why didn't that happen?

6      A    Because an individual I thought was Randall

7    Palmer ran through the garage.  And I didn't want to go

8    in -- as I have now learned again, that's something that

9    blanked out on me, I guess.  I forgot all about this dog

10   they had tied up, a big pit bull in front of the house.

11   I did not want to go in the same way he went, so I went

12   around to the front door.  The door was ajar.  As I was

13   announcing myself, that's when I entered the door.

14     Q    Okay.  Did you have to change your plan as you

15   pulled up?

16     A    I don't know -- I think the only thing that

17   changed is the dog was in the way.

18     Q    Where was the dog?

19     A    Right toward the front of house so that no one

20   could get in.

21             MR. MANN:  Counsel, will you let me know

22   when we get -- I know you're right in the middle of a

23   factual pattern.  Can we take a bathroom break?

24             MR. MATTINGLY:  Give me one minute and we

25   will take a break.

Page 63

1   house.  (Indicating)

2       Q    Okay.  You drew a rectangle where your car was

3   parked.  And can you draw a dotted line of the path you

4   took into the house?

5               MR. MANN:  Objection to the form of the

6   question.  Go ahead if you can.

7       A    Best of my knowledge --

8       Q    (By Mr. Mattingly) Do you understand what I'm

9   asking, sir?

10      A    Yes.

11      Q    You parked the car and you ran to the house,

12  didn't you?

13      A    Exited the car and ran to the house --

14      Q    Okay.  Draw a dotted line --

15      A    -- in pursuit of someone, yes, sir.

16      Q    Draw a dotted line that shows the path you took

17  from your car to the house.

18      A    I'm just not going to be 100 percent accurate.

19  But I assume from where I was at, like this.  I was

20  still keeping an eye making sure he didn't come out

21  here.  And I was trying to get around the dog.  And I

22  believe the other officer was yelling about the dog.

23          I don't -- this is what I -- my memory is not

24  100 percent on this.  But -- and I eventually got around

25  the dog and this is the path I took right here.

Cherry, Kenneth                                    October 18, 2013

Page 65

1    A    I don't recall doing that, no, sir.

2    Q    Okay.  Had you ever inquired from the residents

3  of the house as to who lived there?

4    A    No, sir.

5    Q    Why not?

6    A    I just assumed that because of other officers

7  had been at that address before looking.  The person

8  that I took over drug court with, that was their

9  compliance officer before also told me the address that

10 he lived at, frequented.

11   Q    Was it your assumption that he lived there

12 alone?

13   A    Yeah.  I mean, I didn't assume anybody else

14 did, you know.

15   Q    When you pulled up there were children's toys

16 in the yard, weren't there?

17   A    I don't recall that.

18   Q    You didn't notice them if there were?

19   A    I did not.  I was focused on what I was doing.

20 I had already seen an individual running so --

21   Q    Okay.  Did you wait for entrance into the

22 house?

23        MR. MANN:  I'm sorry.  What did you say?

24   Q    (By Mr. Mattingly) Let me ask you this.  Did

25 you knock on the door?

Cherry, Kenneth                                    October 18, 2013

Page 66

1       A    No, sir.

2       Q    Why not?

3       A    The door was ajar.  It was already open,

4   basically.

5       Q    Was there a screen door?

6       A    No, sir.

7       Q    Are you sure?

8       A    I'm not 100 percent sure, but it -- I didn't

9   touch a screen door.

10      Q    Was there only one door at the entryway of the

11  house?

12      A    That I saw.

13      Q    You went through it.  You would know, wouldn't

14  you?

15      A    You mean at that spot right there, sir?  Is

16  that what you're talking about?

17      Q    The point where you walked through the front of

18  the house.

19      A    One door.

20      Q    There was one door without a screen door.

21  Correct?

22      A    I seen no screen door, no, sir.

23      Q    Did you have to push a wood door open to get in

24  the house?

25      A    Pushed a door open.

Cherry, Kenneth                                          October 18, 2013

Page 67

```
 1      Q    Okay.

 2      A    I don't know if it was wood or metal.

 3      Q    Did you pause after you pushed the door open?

 4      A    No, sir.

 5      Q    You went straight through?

 6      A    Screaming, yes.

 7      Q    What?

 8      A    Screaming "Police, police."

 9      Q    Why were you screaming "Police, police"?

10      A    That's what I done in other warrants.

11      Q    Okay.  Had you had training on the proper

12   protocol when you were entering a house?

13      A    I was reserving for Wewoka.  I went on numerous

14   warrants.

15      Q    Okay.  Had you had any training?

16      A    I considered that training.

17      Q    Okay.  Who was your trainer?

18      A    The officers that I was on duty with from the

19   Chief of Police, Assistant Chief of Police, Sergeant

20   Vehill, Officer Glasco.

21      Q    Okay.  You had seen Wewoka police officers

22   enter private dwellings --

23      A    Yes, sir.

24      Q    -- to serve warrants?

25      A    Yes, sir.
```

Cherry, Kenneth                                    October 18, 2013

Page 68

1      Q    What kind of warrants?

2      A    Um, search warrants.  Because I -- I don't know

3   how to do this.  I assume they were -- I know they were

4   signed by a judge on every warrant to enter the house.

5      Q    Do you know what the difference is between a

6   bench warrant and a search warrant?

7      A    A bench warrant, my understanding is they have

8   a warrant for arrest.  If I run into that individual or

9   pull them over, they have an outstanding warrant, I can

10  pick them up.  A search warrant is where I'm signed by a

11  judge where I can search that premises with probable

12  cause.

13     Q    Okay.  In your mind as you pulled up to the

14  house on Killingsworth on August 25th, 2013, I think we

15  have established you thought there was one resident of

16  the house, Randall Palmer.  Yes?

17     A    Yes, sir.

18     Q    Why did you think that?

19     A    Because of the information that I had been

20  given and I had seen him, matching his description, and

21  his vehicle was parked that I had seen.

22     Q    What information had you been given?

23     A    From drug court.  And like I said, other

24  officers, deputy and police had told me before.

25     Q    Who at drug court told you that he was living

Cherry, Kenneth                                    October 18, 2013

Page 69

1   there alone?

2       A   I don't know if they said he --

3               MR. MANN:  Object to the form of the

4   question.  Go ahead.

5       A   Tammy Wall.  Janis, and I don't know her last

6   name.  There's another kid that worked there.  I believe

7   his name was Kyle, I believe.  And I'm not -- the only

8   ones I know of there from drug court, anyhow, and the

9   sheriff's department and police department.

10      Q   (By Mr. Mattingly) Did any of these people tell

11  you he lived there by himself?

12      A   I don't remember.

13      Q   Did any of these people tell you who the

14  residents of that house were?

15              MR. MANN:  Object to the form.

16      A   No, sir.

17      Q   (By Mr. Mattingly) Did that ever come up in

18  conversation with Tammy, Janis or Kyle?

19      A   Not that I remember.

20      Q   You never discussed with Tammy, Janis or Kyle

21  who the residents were of the house on Killingsworth

22  where Aaron Palmer was shot?

23              MR. MANN:  Object to the form.

24              MR. ANDERSON:  Same objection.

25      A   Not that I recall.

Cherry, Kenneth                                      October 18, 2013

Page 70

1      Q    (By Mr. Mattingly) Is that a true statement?

2              MR. MANN:  Object to the form.  Go ahead

3    and answer it if you can.

4      A    I don't remember.  I don't remember.

5      Q    (By Mr. Mattingly) Okay.  Well, let me ask you

6    again.  Why did you think Randall Palmer was the only

7    resident of that house?

8              MR. MANN:  Asked and answered.  Go ahead

9    and answer it again.

10     A    That was the address that I was given where he

11   lived, where Randall Palmer lived.  That's who I thought

12   was the resident.  They said he was the legal person

13   renting the house.

14     Q    (By Mr. Mattingly) Okay.  Who said that?

15     A    Drug court.  I can't tell you which one told

16   me, because I was given information when I would come

17   each day where they have got the latest information on.

18     Q    Was there an address on the warrant of where he

19   lived?

20     A    I don't believe there was.  I don't believe

21   there was.

22     Q    Did you search for him at any other homes?

23     A    No.

24     Q    At any time?

25     A    No.

Cherry, Kenneth                                          October 18, 2013

Page 71

1    Q    When did drug court personnel tell you Randall
2  Palmer lived at that house?
3    A    It would have been at various times, you know.
4  They would give me addresses on their individuals that
5  were AWOL from drug court.
6    Q    What I'm trying to figure -- do you remember
7  someone from drug court telling you Randall Palmer lived
8  at that house?
9    A    Absolutely.  Joe Glasco, their former
10  compliance officer.
11    Q    Okay.  Did Joe Glasco tell you Randall Palmer
12  lived there?
13    A    Because he had been by there looking for him
14  also.
15    Q    Who was Joe Glasco employed with at the time?
16    A    Well, at that time, drug court and the Wewoka
17  Police Department.
18    Q    And did Glasco say why he thought Randall
19  Palmer lived there?
20    A    No, sir.  I just assume that was the address he
21  was given also from drug court.
22    Q    Okay.  Who else from drug court told you, other
23  than Joe Glasco, that you remember that Randall Palmer
24  lived at that address?
25    A    The names that I give you right there.

Cherry, Kenneth                                          October 18, 2013

Page 102

1      A    By being there.  Helping me -- by serving the

2   warrant they are going to help me from him escaping.  He

3   had been on the run nine months, so he has run before.

4      Q    Okay.

5      A    I know that was what was in my mind of him

6   running.

7      Q    Keep going.  You called for backup.

8      A    I got backup.  We had a briefing at a little

9   Quick Mart there.  She sent them.  We had a briefing,

10  decide what we're going to do.  Best of my knowledge --

11  as I described to you earlier what we were going to do.

12  I thought two other cars were coming with me when we had

13  the briefing.  I'm not sure how many was behind me.  And

14  we were going to cover the back, the exits.

15          Basically, I exited the car as I seen the

16  individual running.  In the spot I told you, I saw the

17  individual running into the garage so I was in pursuit.

18  I didn't want to go in the same door where they were at.

19          And there was a dog there that was barking,

20  barking off the chain.  I did not want to go through

21  that area.  I got around the dog, came through the front

22  door.  The door was ajar.  I'm yelling "Police, police."

23  I enter the door.  And from me to that wall an

24  individual came at me with something shiny and it looked

25  like a knife to me.  I reacted and I shot him.

Page 112

1    conversation?

2        A    Yes, sir.

3        Q    And how long did it take the other officers to

4    get there?

5        A    Not very how long.  Within ten minutes.

6        Q    So the other officers arrive.  And we know Hill

7    was there.

8        A    I didn't know at the time.  I didn't know his

9    name.

10        Q    Okay.  How many officers showed up there?

11        A    I'd say anywhere from -- at first four to five,

12    and there may have been some others come in after, you

13    know, we were talking.

14        Q    Okay.  And what did you tell those officers

15    when they arrived?

16        A    That I needed to serve a warrant on Randall

17    Palmer, an arrest warrant from drug court.  And they

18    were -- just from their reaction, they were aware of

19    him.  And we -- like I said, we had a little briefing.

20    I don't know word-for-word exactly what was said.  I

21    know I was in the lead coming to the house.  My

22    understanding was there was going to be somebody behind

23    me, I assumed two cars, like I said, and somebody was

24    going to come in the back.  That's what I remember about

25    it.

Page 113

1      Q    Did you guys ever discuss who lived at the
2  house?
3      A    No, sir.
4      Q    How was the plan arrived at, just who would
5  follow you and who would go around back?
6      A    Well, I was the drug court compliance officer,
7  so I just assumed I was taking the lead and I'm the one
8  that had the warrant.
9      Q    You were wearing a Wewoka PD shirt at the time?
10     A    Yes, sir.
11     Q    Did you show anybody the warrant?
12     A    Yes.  I believe -- I want to say it was that
13  Eubanks one, I believe, the one that's bald headed that
14  I described.
15     Q    Did you tell those officers at the Strothers
16  Market what capacity you were in when you were there?
17     A    They all knew that I was -- I assume they all
18  knew I was drug court.  I told them.  I had a different
19  vehicle and everything like that.  It was marked drug
20  court on the back of it.  I was pretty familiar with the
21  other officers, other than their names and stuff.
22     Q    Okay.  And you departed from there and you
23  started for the house at Killingsworth?
24     A    Yes, sir.
25     Q    Did anything happen that altered your plan

Page 114

1    before you got to the house?

2        A    Before I got to the house?  Not that I know of.

3        Q    Did the officers get separated from you on the

4    way to the house?

5        A    I didn't see them behind me so I don't know

6    what they did.  I think I later learned that they might

7    have -- one went on another street or something.  I

8    don't know.  That may be hearsay.

9        Q    Was the timing of this arrest worked out, if

10   they would get in position first?  Was there any

11   discussion about the timing?

12       A    No, sir.

13       Q    Okay.  Well, in your mind how would it work?

14   If you were first there were you going to wait on them

15   to get in position?

16       A    My feeling of the situation at that time, they

17   were already in position.  They were behind the house,

18   whatever street.  They knew where they were going.  I

19   mean, we discussed like that.  They were going to cover

20   the back.  And I had officers coming with me.  I thought

21   there was two.  I found out there was one.  I was going

22   to take the front.  They were going to take the back.

23            So I headed -- I headed in -- only reason I

24   pursued is because when I saw him running I took action,

25   and that's what I did, and everybody else followed suit.

Page 115

1    Q    The other officers that were supposed to be

2  behind the house, were they going to circle around to

3  the south of the house?

4    A    It would have been -- yeah, it would have been

5  south.  I don't know how -- if they stopped up the road

6  a little bit and came running behind.  I don't have any

7  idea where they were at.

8    Q    Was there discussion of how they would get to

9  the back of the house?

10    A    No, sir.  I don't remember that.

11    Q    Is there a street -- the back of the house is

12  to the south?

13    A    Yes, sir.

14    Q    And the front of the house is to the north.

15  Correct?

16    A    That's my understanding.

17    Q    Do you know where the officers went that were

18  supposed to guard the back of the house?

19    A    No, sir.

20    Q    Was there a discussion of where they would go?

21    A    I remember the discussion we were going to

22  cover the entrances, which they said were the back and

23  the front.  That's what I recall.

24    Q    Did you at any time check and make sure

25  everybody was in position before you proceeded to the

Page 116

1    house?

2        A    No, sir.

3        Q    Did you at any time check to make sure

4    everybody was in position?

5        A    No, sir.  I was already in pursuit of someone.

6        Q    Okay.  And as you were driving up Killingsworth

7    to the house do you know who was behind you?

8        A    No.

9        Q    Did you check?

10       A    No.

11       Q    Okay.  When you pulled up to the house and got

12   out you didn't know if you had backup, did you?

13               MR. MANN:  Object to the form.

14       A    No.  I believed I had backup.  I just didn't

15   know who it was.

16       Q    (By Mr. Mattingly) Okay.  Well, you hadn't

17   checked to see if anybody was behind you and you didn't

18   know.  Correct?

19       A    No, sir.  I didn't see them physically standing

20   behind me.  I seen the other patrol car behind me.  I

21   assume that's who came behind me, another officer.

22       Q    When did you see the other patrol car behind

23   you?

24       A    As I was driving down that road.

25       Q    Okay.  As you were approaching on Killingsworth

Cherry, Kenneth                                          October 18, 2013

Page 121

1      A    No, sir.

2      Q    Why didn't you?

3      A    He had been known to be dangerous, armed.  I

4  would have been warned by many people about him.

5      Q    Okay.

6      A    I think the record speaks for itself on him, my

7  understanding, and as I have seen since, you know.

8      Q    Okay.

9      A    I mean, that's just my understanding.

10     Q    In hindsight did you go in that house before

11  all the police officers had set up at their pre-assigned

12  locations?

13            MR. MANN:  Objection to the form of the

14  question.  And you're assuming things not into evidence

15  he's testified about already.

16     Q    (By Mr. Mattingly) You may answer.

17     A    I assumed the officers were where they were

18  supposed to be, because the officer was behind me.  I

19  saw the police cars behind me.  I assumed they were

20  doing the same thing.  I didn't think they were going to

21  sit in there and listen to the radio.  I mean, they were

22  coming with me to back me up.

23     Q    What's the down side of checking, radioing to

24  see?

25     A    Well, that individual would have been gone.

Cherry, Kenneth                                    October 18, 2013

```
                                                   Page 128
1        Q    Of the guy in the garage running?

2        A    Yes.

3        Q    Okay.  So you proceed to the house.  Did you

4    stop and wait on the officer behind you at any time?

5        A    No, sir.

6        Q    Okay.  Did you wait on anything when you were

7    approaching Killingsworth until the time you pulled your

8    trigger?

9        A    I don't believe I did, because I was in pursuit

10   of the person I thought was Randall Palmer.

11       Q    Okay.  Did you have to slow down and get around

12   a dog?

13       A    Yes, sir, I did.

14       Q    You pushed open the front door and there you

15   saw someone or something shiny in their hand; is that

16   correct?

17       A    Yes, sir.

18       Q    Describe what you saw in their hand.

19       A    When I came through it was just very -- all it

20   was was I saw a very shiny, and he had it in his hand

21   like that. (Indicating)

22            MR. ANDERSON:  For the record, can we

23   describe that, how he had his hands?

24       A    Yes, sir.  About shoulder length.  And all I

25   recall is -- I recall his other hand up, but shouting,
```

Cherry, Kenneth                                          October 18, 2013

                                                              Page 129

1    shouting.  That's all I remember.  And I had focused

2    where I shot him in the shoulder.

3           And after that I cleared the rest of the house.

4    Do I continue or do you need to ask me something else?

5    As I was clearing the house I heard the other officer

6    yelling to him, "Why would you pull a knife on an

7    officer?"  "Why would you pull a knife on an officer?"

8           And when I came out of the house I seen a

9    little girl jumping on a trampoline.  I was going to get

10   over a fence, and then I started shaking and I just knew

11   that I needed to let them take over.  I was upset

12   because the little girl I saw.  I didn't know if that

13   was his daughter at the time or anything like that.  I

14   just -- she shook me up.

15       Q    (By Mr. Mattingly) Which hand was the shiny

16   object in?  Right or left?

17       A    I don't recall.  I really don't recall.

18       Q    Well, can you remember from your perspective,

19   was it to your right or left?

20       A    Honestly, sir, I don't -- at this moment, you

21   know, I don't -- I mean, I know I told -- when I was

22   interviewed then I might have had a better recollection.

23   But I don't -- like I said, I've had a lot of time to

24   try to get this out of my mind and so I've forgotten

25   some things.

Cherry, Kenneth                                          October 18, 2013

                                                              Page 130

```
 1      Q    How much time elapsed between the time you
 2   pushed on that front door and you squeezed the trigger?
 3      A    Seconds.
 4      Q    Was it instantaneous?
 5      A    Like I said, seconds.  Because as soon as I
 6   seen the object it looked like he was coming toward me.
 7   I reacted.
 8      Q    Mr. Cherry, when you say seconds, that could be
 9   two seconds or that could be a hundred seconds.  So I'm
10   trying to get some idea of how quickly all of this
11   happened.  Okay?
12      A    Within two seconds, sir, I would say.  Very
13   short time.  I mean, if I was guessing.
14      Q    When the door opened, as the door opened could
15   you see him standing right there?
16      A    When the door opened he appeared just that
17   quick.
18      Q    Was he already there or did he appear?
19      A    He appeared to me in my vision that he was
20   coming at me in an aggressive deal with the object that
21   I saw.  So, I mean, I don't know what he was doing
22   before that or anything like that.
23      Q    Okay.  As that door opened you got a new line
24   of sight, didn't you?
25      A    Absolutely.
```

Cherry, Kenneth                                          October 18, 2013

Page 134

1      A    I just had -- it happened so quick, but I

2    wasn't aiming -- I was just aiming for his mass.  That's

3    what I was aiming for.

4      Q    Did you have your gun drawn when you went

5    through the front door?

6      A    Yes, sir.

7      Q    When had you drawn your gun?

8      A    As I was coming up the walk.

9      Q    Okay.  You didn't draw your gun before you hit

10   the sidewalk?

11     A    I don't recall.  I don't remember doing that,

12   no, I don't.

13     Q    Well, could you have and you don't remember or

14   are you saying you did not until you hit the sidewalk?

15     A    Could have and don't remember.

16     Q    Okay.  You don't know when you drew your gun.

17   You just know it was drawn by the time you hit the

18   sidewalk.

19     A    Yes, sir.

20     Q    And how were you holding the gun as you

21   proceeded up the sidewalk?

22     A    Tactical position.

23     Q    Who taught you the tactical position?

24     A    One of the officers over at -- that's not

25   necessarily true.  I had to have CLEET training through

Cherry, Kenneth                                    October 18, 2013

Page 135

1    the prison system and I qualified with a weapon through

2    CLEET, and we took up tactical positions holding a

3    weapon.  And I also had training in my concealed weapons

4    also.  But I had additional training by other officers

5    giving me other ideas and, you know, ways they do

6    things, stuff like that.

7        Q    How far away was Mr. Palmer when you pulled the

8    trigger?

9        A    Whatever this distance would be from here to

10   there.  Maybe five to six feet, maybe, something like

11   that close.  Not very far.  (Indicating)

12       Q    When you squeezed the trigger you were aware he

13   had something shiny in his hand.  Correct?

14       A    Yes.  I believed it to be a weapon, a knife.  I

15   didn't believe it was a gun.  I knew it was a weapon.

16       Q    How did you know it was a weapon as opposed to

17   an egg beater?

18       A    Just in the aggression -- in the aggressive

19   move that he was making toward me.

20       Q    How much time elapsed from the time you saw him

21   to the time you squeezed the trigger?

22       A    Just in that same room, sir, a couple of

23   seconds.

24       Q    Two seconds?

25       A    At least.  He was on me.  As you know, there's

Cherry, Kenneth                                October 18, 2013

Page 136

1    a 21-foot rule, what I was taught, that someone can stab
2    you even from that distance.  It was just a natural
3    reaction.  And I wouldn't have done anything different
4    in that situation right there.
5        Q    I want to be clear so there is no confusion.  I
6    don't want to misstate your testimony.  You push the
7    door open and he's already standing there.  Correct?
8        A    (Nods head.)
9        Q    The answer is yes?
10       A    Yes.  I'm sorry.
11       Q    I'm sorry.  It's hard for her to take head
12   shakes and nods.
13       A    I'm sorry.
14       Q    And he's standing there and you think there was
15   at least two seconds went by before you pulled the
16   trigger?
17               MR. MANN:  Asked and answered.  Go ahead.
18       A    A few, yeah, a couple of seconds.  I know I was
19   in my position already.  When I got through the door I
20   was in my tactical position.  And like I said, it was
21   just almost as soon as I went into the position he was
22   standing there with a weapon in his hand and I shot him.
23       Q    (By Mr. Mattingly) Had you already assumed
24   tactical position?
25       A    When I got through the door I did.  I had to

Page 137

1    push the door open.  And this is where I don't remember

2    if I used my foot or I pushed it open with my elbow, my

3    hand.  I do not remember.

4        Q    Okay.  You pushed it open, assumed tactical

5    position, at least two seconds went by and then you

6    pulled the trigger.  Is that true?

7        A    To the best of my knowledge.  I mean, I don't

8    think anybody in this world, unless you had a stop watch

9    on, that could tell you exactly how many.  It was just

10   very instantaneous.  It happened.

11       Q    Did you tell him to drop what he had in his --

12       A    I had no time to do that, sir.

13       Q    Did you give him any commands?

14       A    I was just yelling "police."  I had no time.

15       Q    Why do you think it was a weapon in his hand as

16   opposed to something harmless?

17       A    Because it looked like a knife to me.  That's

18   exactly what it looked like to me.  The weapon, it was

19   very long and shiny.  And in the aggressive manner he

20   was in and the screaming he was doing, it was just that

21   quick.  It was all together like that.

22       Q    Now, he was -- Aaron Palmer was screaming when

23   you went through the door?  Is that your testimony?

24       A    Right, right.

25       Q    Was he screaming before you went through the

Page 138

1    door?

2        A    No, sir.

3        Q    Okay.  Did you open the door, make eye contact,

4    and then he started screaming?

5        A    No, sir.  When -- when I opened the door I

6    saw -- I just saw the weapon.  Like I said, he was in a

7    forward motion aggressively toward me.  And I just

8    saw -- I didn't see his face.  I didn't see -- I saw the

9    weapon and that's why I shot.

10        Q    After you pulled the trigger what did Aaron

11    Palmer do?

12        A    I know he dropped to the ground and that's it.

13    Because right then the other officer is behind me and

14    I'm yelling, "Clearing the house."  And he was over him

15    with a weapon, over Mr. Palmer.  And I cleared the house

16    and I came back through.  I said, "Clear."

17            And Mr. -- I didn't know at the time, but I got

18    to reflect back on some of this that Mr. Hill had yelled

19    and said, "I see him running."  I don't know who he saw

20    running or whatever.  He assumed that it was Randall.

21            And then, like I said, as I finished the

22    kitchen, came back through, I heard him yelling at

23    Mr. Palmer, "What were you thinking pulling a knife?"

24    And I never saw anybody else in that house.  I never saw

25    anybody else but who I shot.  Came outside the door.

Page 141

1     A    It's just that's when you have -- the use of

2    deadly force comes in.  If they have got something, you

3    know, you have to react with what self defense you have.

4              MR. MANN:  Counselor, are you -- we're

5    12:21.  Lunch time or are you going to keep going?

6              MR. MATTINGLY:  This is a good place if

7    you all want to break.  Let's go off.

8                   (The lunch break was had from 12:21 to

9                    1:15 p.m.)

10    Q    (By Mr. Mattingly) Mr. Cherry, what was Aaron

11   Palmer screaming when you went through the door?

12    A    I don't know what he was saying.  Just

13   screaming.  Just shouting.

14    Q    Was it one shout, two shouts?  Was it a quick

15   staccato?

16    A    Yeah.  I just heard him shouting.  I don't know

17   how long it was or what he was saying, so -- it was just

18   loud.

19    Q    Can you give me any more specificity?

20    A    No, sir.

21    Q    How close was the knife when you pulled the

22   trigger?

23    A    Well, if I was guessing, four feet, maybe,

24   maybe that close, closer, to me.

25    Q    From the time you saw him to the time you pull

Cherry, Kenneth                                    October 18, 2013

Page 142

```
 1    the trigger, did his body advance toward you?
 2        A    What I recall was he was advancing toward me.
 3    I couldn't tell you how far or, you know, anything like
 4    that.
 5        Q    Is your answer you're not sure if he
 6    advanced --
 7        A    Yeah.
 8        Q    -- toward you?
 9        A    No.  He was in a forward motion toward me.
10    That's what it appeared to me.
11        Q    Did you see anyone else in the house?
12        A    No, sir.
13        Q    When did he scream?  Was it before you went
14    through or after you went through the door?
15        A    No.  I didn't hear anything until when I opened
16    the door.  That's when I heard the noise, him shouting
17    as I saw the knife.  That's when I heard the shouting.
18        Q    When you opened the door, then did he shout?
19        A    That's when I heard it.
20        Q    You would have heard him shouting before then
21    if he was shouting, wouldn't you?
22        A    I believe so.  The dog was barking real loud.
23    I don't recall.
24        Q    Did the dog get after you?
25        A    Oh, he -- the chain helped me out.  He would
```