# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| **NICOLE ATTOCKNIE, as personal representative of Estate of Aaron Scott Palmer,** *et al.***,** | ) ) ) ) |
| **Plaintiff,** | ) ) |
| **vs.** | ) **Case No. CIV-13-158-JHP** |
|  | ) |
| **SHANNON SMITH, Sheriff of Seminole County,** *et al.***,** | ) ) ) |
| **Defendants.** | ) ) |

## ORDER

This matter comes before the Court on the Motions for Summary Judgment by Defendant Cherry (Dkt. No. 107), Defendant Smith (Dkt. No. 108), and Defendant Wall (Dkt. No. 110). On June 2, 2014, Plaintiff filed responses to said motions (Dkt. Nos. 124, 126, and 125, respectively). On June 16, 2014, Defendants filed their replies (Dkt. Nos. 150, 152, and 151, respectively). Also pending before the Court is Defendant Wall's Motion to Dismiss (Dkt. No. 94). Plaintiff filed their response on April 24, 2014 (Dkt. No. 101) and Wall replied on May 1, 2014 (Dkt. No. 104).

## STATEMENT OF UNDISPUTED FACTS

On July 23, 2012, Sheriff Shannon Smith ("Sheriff") appointed Defendant Kenneth Cherry ("Cherry") as a deputy. *See*, Dkt. Nos. 110-4 and 125-2, at p. 11, Notification of Employment; Dkt. No. 107-7, at p. 2, Letter from District Attorney of Okmulgee County (indicating at time of shooting Cherry was an employee of the Seminole County Sheriff); and

Dkt. No. 125-2, at p. 10, Notification of Termination. While contending that she "hired" Defendant Kenneth Cherry ("Cherry") as a compliance officer, it is undisputed that Defendant Tammy Wall ("Wall") could not hire Cherry as a Compliance Officer without Sheriff's Smith's approval and commission from his office. Cherry began as a compliance officer on July 25, 2012. Wall and Smith never agreed on who would supervise and train Cherry. Smith did not provide any training to Cherry before he was assigned to the Seminole County Drug Court as a compliance officer. Sheriff did not supervise Cherry, or give him directives of any kind while Cherry was serving as a compliance officer. Additionally, while serving as compliance officer, Cherry was not required to respond to Seminole County Sheriff's Office calls, or Wewoka Police Department calls. Cherry also was not required to attend Seminole County Sheriff's Office meetings and did not wear a Seminole County Sheriff's uniform in the performance of his duties. Furthermore, the sheriff did not provide Cherry, or any of the other drug court compliance officers, with a copy of the Seminole County Sheriff's Office's policies and procedures. Prior to being commissioned by the Sheriff, however, Cherry served approximately seven months as a volunteer reserve police officer for the City of Wewoka, Oklahoma and had worked for a little over two years as a corrections officer. The Oklahoma Council on Law Enforcement Education and Training ("CLEET") records do not contain any record of formal training while Cherry was a reserve officer for Wewoka.

Randall Scott Palmer[1] entered into a performance contract with the Seminole County Drug Court on or about May 5, 2011. One of the requirements of this contract was attendance at all court sessions. On September 9, 2011, a bench warrant was issued by the District Court of Seminole County due to Randall Palmer's "FAILURE TO APPEAR/NON-COMPLIANCE WITH PERFORMANCE CONTRACT." Dkt. No. 108-4.

Prior to August 25, 2012, Cherry had been warned by individuals that Randall Palmer was dangerous and possibly armed. On August 25, 2012, Cherry contacted the Seminole Police Department to enlist their assistance in serving the outstanding warrant at 1931 Killingsworth Avenue in Seminole, Oklahoma where Randall Palmer had been earlier in the day.[2] Cherry met with Seminole City Police officers at a Quick Stop in Seminole to develop a tactical plan for service of the warrant.

After making a tactical plan, Seminole officers accompanied Cherry back to the Killingsworth residence. As he approached the front door of the residence, Cherry had to go around a large pit bull chained and barking in front of the house. Upon entering the residence, Cherry shot Aaron Palmer one time in the chest. A Seminole Police Officer

---

[1] The various motions filed herein all refer to this person as "Randel Palmer." The pleadings in Seminole County Drug Court refer to this person as "Randall Scott Palmer." As a result, the Court shall use the legal name contained on the official court pleadings.

[2] Randall Palmer had lived at this address up through the year 2008. On August 25th and immediately prior thereto, however, Randall Palmer's son, Aaron Palmer, lived at this residence with his common-law wife, Nicole Attocknie, their daughter M.P. and their foster son, Damien Ruiz ("Ruiz"). Also, Randall Palmer's daughter, Tiffany Palmer, frequently came to the house on Killingsworth Avenue. Although Randall Palmer no longer officially lived at the residence, he continued to come into the house when Attocknie was not there. Randall Palmer had a silver car and he would park it in the field across the street from the house on Killingsworth Avenue, behind a bush or a tree.

entered the house immediately thereafter. Cherry continued to clear the house and saw a knife in the foyer of the house.

Following the shooting, Sheriff Smith received a call about an officer-involved shooting and arrived at the scene. Upon arrival, Sheriff observed Randall Palmer's car parked outside near the residence. Cherry handed his weapon to Sheriff Smith, who placed the weapon in his patrol car. The Oklahoma Bureau of Investigation ("OSBI") conducted the investigation into the shooting.

Both Aaron Palmer, Nicole Attocknie, and Ruiz were aware that Randall Palmer had a warrant outstanding for his arrest because law enforcement officers had been at the Killingsworth residence looking for Randall Palmer in May of 2012. Additionally, Nicole Attocknie and Aaron Palmer were scared of Randall Palmer and he posed such an unpleasant and unwanted aspect of their lives that they were packing and planning on moving to an undisclosed location to get away from him. Nicole Attocknie was aware that Aaron feared his father, Randall, because he had physically abused him and specifically had beaten him while in a car at a casino in 2011.

Following the shooting, Nicole Attocknie commented to EMT Potterfield at the hospital that "they were going to move away from all this" and that she had personally called the Seminole Drug Court and the cops to come and get "him" although she did not specify who she meant by "him." Aaron Palmer passed away later that night at the Shawnee Medical Center.

## LEGAL ANALYSIS

Summary judgment is appropriate where there is no dispute of material facts and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.56. Defendants have the initial burden to show the absence of evidence to support Plaintiff's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). As a result, the defendants must identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which establish the absence of any genuine issues of material fact. Fed.R.Civ.P. 56(c). Plaintiff, as the nonmoving party, must go beyond the pleadings and "must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which [he] carries the burden of proof." *Applied Genetics Intern., Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990).

When presented with a summary judgment motion, this Court must determine whether there "are any genuine factual issues that properly can be resolved only by the finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment is not appropriate if there exists a genuine material factual issue. *Anderson*, 477 U.S. at 249-251. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*, 477 U.S. at 248. "Material facts" are "facts that might affect the outcome of the suit under the governing law." *Id.*

When evaluating a motion for summary judgment, this Court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988). The party opposing summary judgment, however, "may not rest upon mere allegations or denials of his pleading but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## I.  Motion for Summary Judgment by Defendant Wall

On March 13, 2014, the Court entered an order dismissing this action against Defendant Wall based upon Eleventh Amendment immunity (Dkt. No. 83). Thereafter, Plaintiff filed a Second Amended Complaint (Dkt. No. 84). On April 11, 2014, Defendant Wall filed a Motion to Dismiss Plaintiff's Second Amended Complaint (Dkt. No. 94) claiming she is immune from suit under the Eleventh Amendment to the Constitution. Before this Court could rule upon said motion, Defendant Wall filed her Motion for Summary Judgment (Dkt. No. 110). After reviewing all of the pending motions, this Court asked Defendant Wall to supplement her motion for summary judgment by advising the Court what governmental entity actually issues her paycheck and what retirement system, if any, she is authorized to participate in (Dkt. No. 145). On June 27, 2014, Ms. Wall advised the Court she receives a paycheck from a bank account held by the 22nd Judicial District Drug Court - Seminole Division, Seminole County Court Special Programs. Dkt. No. 165. Ms.

Wall advised, however, that she participates in a retirement system through Seminole County and receives all benefits through Seminole County.  *Id.*

*a.  Eleventh Amendment immunity*

In her motion to dismiss the second amended complaint, Wall asserts she has Eleventh Amendment immunity.  Wall has incorporated this argument into her Motion for Summary Judgment.  While a state and its employees are entitled to Eleventh Amendment immunity from suits brought in federal court, this immunity does not apply to counties and/or their employees. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).  Thus, the question is whether the Seminole County Court Special Programs is an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a political subdivision to which the Eleventh Amendment does not apply.  Moreover, even if the program is an arm of the State, this Court must determine whether Wall is a state or county employee.

In considering whether an entity constitutes an "arm of the state," courts review four primary factors.  First, a formalistic survey of state law is conducted to ascertain whether the entity is identified as an agency of the state.  Second, the court must examine the degree of autonomy given to the agency.  Third, the court considers the entity's sources of financing.  Finally, the court asks whether the entity is concerned primarily with local or state affairs, which will  turn upon the agency's function, composition, and purpose.  *Steadfast Ins. Co. Agricultural Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007) and *Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000).

Based upon the Oklahoma statutes, this Court finds felony drug courts are an instrumentality of the State of Oklahoma since counties have no authority to establish felony drug courts. *See*, OKLA. STAT., tit. 21, § 471 and tit. 20, § 91.1. In this case, however, considering the facts in the light most favorable to the plaintiff, it appears the State of Oklahoma contracts with Seminole County to help support the functions of some special court programs. *See*, Dkt. No. 165-1, Affidavit of Tammy Renee O'Daniel Wall, at p. 2 ¶ 4. According to the Second Amended Complaint, Wall has "administrative and executive (but not judicial) policymaking authority for Special Programs, which allows her to promulgate, create, implement or be responsible for the continued operation of a policy regarding the hiring, firing, supervising, and disciplining of her employees . . . ." Furthermore, the Second Amended Complaint asserts Special Programs is "an Administrative Agency **distinct** from the District Courts of Oklahoma." Additionally, unlike normal court functions, the Seminole County Special Court's Program, according to the Second Amended Complaint, "sponsors sporting events." Finally, according to Wall's affidavit, it appears that Wall is not a state employee. Rather, she is a county employee as she participates in the Seminole County retirement system and receives Seminole County benefits. Moreover, the purpose of the special drug courts appear to be diversion of individuals from the traditional court system. Considering all of these facts in the light most favorable to the plaintiff, this Court finds Wall is not a state employee and thus, she is not entitled to Eleventh Amendment immunity.

<u>*b. Qualified immunity*</u>

The doctrine of qualified immunity protects government officials from individual liability for civil damages insofar as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Once qualified immunity is raised, the plaintiff bears the burden of presenting (1) sufficient facts to establish that the defendant's conduct violated the law and (2) demonstrating that the relevant law was clearly established when the alleged violation occurred. *Clanton v. Cooper*, 129 F.3d 1147 (10th Cir. 1997). In assessing whether Plaintiff has asserted a violation of a constitutional right and whether the constitutional right was clearly established so that reasonable officials would have understood that their conduct violated that right, this Court must construe the Second Amended Complaint in the light most favorable to Plaintiff, accept all well-pleaded allegations as true, and draw all reasonable inferences in Plaintiff's favor. *See*, *Bella v. Chamberlain*, 24 F.3d 1251, 1254 (10th Cir. 1994).

In resolving questions of qualified immunity at summary judgment, courts engage in a two pronged inquiry. The first asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . .show the officer's conduct violated a [federal] right[.]" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

\* \* \* \* \*

The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation. *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ibid.* "[T]he salient question . . . is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional." *Id.*, at 741, 122 S.Ct. 2508.

*Tolan v. Cotton*, — U.S. —, 134 S.Ct. 1861, 1865-1866 (2014).

Since Wall was not present at the shooting, Plaintiff's theory of liability against Wall is premised upon supervisory responsibility. In particular, Plaintiff alleges Wall is liable under § 1983 for completely failing to train Cherry on the proper procedures for the service of an arrest warrant and/or failing to supervise Cherry during the service of the warrant. Even though Plaintiff alleges Wall was the policy maker for the Seminole County Special Court Program, there is no question under Oklahoma law that Wall could not hire Cherry to serve court process without Sheriff's Smith's approval and commission from his office. *See*, OKLA. STAT., tit. 19, §§ 514, 545,[3] 547-548. Furthermore, regardless of who actually issued Cherry's paycheck, there is no question Cherry was commissioned and, thus, "hired" as a deputy.

In *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court indicated "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.*, 489 U.S. at 388, 109 S.Ct. at 1204. To the extent that Cherry was appointed as a "deputy," this Court finds Wall

---

[3]"All work issued out of the district court shall be served by the sheriff or his salaried deputies . . . . . ."

could reasonably have relied on the Sheriff's judgment that Cherry was appropriately trained on how to execute court process. Therefore, based upon the facts of this case, this Court finds the law was not clearly established such that a reasonable person in Wall's position would have known that she needed to provide additional training to Cherry regarding service of court process. As a result, this Court finds Wall is entitled to qualified immunity, grants her motion for summary judgment (Dkt. No. 110) and dismisses this action with prejudice against her.

## II.  Motion for Summary Judgment by Defendant Sheriff

### *a.  Official capacity claims*

In an attempt to avoid liability for Cherry's actions, Sheriff claims Cherry was not his employee. Rather, according to the Sheriff he merely commissioned Cherry to work for the drug court so that Cherry could have the arrest powers he needed to perform his duties as a compliance officer for drug court. See, Dkt. No. 108-3, at p. 2. Moreover, Wall furthers this claim by stating she "hired" Cherry as a compliance officer. Dkt. No. 110, at p. 5, ¶ 11. However, both the documentation surrounding Cherry's appointment and termination as a deputy, as well as, the Oklahoma statutes establish this is a frivolous argument. See, Okla. Stat., tit. 19, §§ 547(A), 548(A), and 545.

Sheriff claims he should not be liable in his official capacity for his failure to train and/or supervise Cherry. Oklahoma statutes provide that the sheriff is responsible for the official acts of the undersheriff and deputy sheriffs. OKLA. STAT., tit. 19, § 547(A).

Furthermore, "the sheriff or his salaried deputies" are required to serve all process issued by the district court. OKLA. STAT., tit. 19, § 545.

In *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-2038, 56 l.Ed.2d 611 (1978), the Supreme Court held a local government is liable under § 1983 for its policies that cause constitutional torts. These policies may be set by the government's lawmakers, "or by those whose edicts or acts may fairly be said to represent official policy." *Id.* A suit against a governmental officer "in his official capacity" is the same as a suit "against [the] entity of which [the] officer is an agent." *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2036, 56 l.Ed.2d 611 (1978). An official capacity suit imposes liability upon the entity that the officer represents. Accordingly, this Court must identify "those officials who have the power to make official policy on a particular issue." *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Once these officials are identified, it becomes a question of fact for the jury to ascertain whether their decisions "caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity." *Id.*, 491 U.S. at 737, 109 S.Ct. at 2724 (citations omitted).

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law' "; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the

> decisions—and the basis for them—of subordinates to whom authority was
> delegated subject to these policymakers' review and approval"; or (5) the
> "failure to adequately train or supervise employees, so long as that failure
> results from 'deliberate indifference' to the injuries that may be caused."
> *Brammer–Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189–90
> (10th Cir.2010) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127,
> 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) and *City of Canton v. Harris*, 489 U.S.
> 378, 388–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)) (internal quotation
> marks omitted).

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010). Moreover, in *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court held that inadequacy of police training may serve as a basis for § 1983 liability where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.*, 489 U.S. at 388, 109 S.Ct. at 1204.

As the chief law enforcement officer of the county, the Sheriff is the official policy maker of the county in all matters related to his statutory law enforcement duties, including the service of court process. *See*, *Reid v. Hamby*, 124 F.3d 217 (10th Cir. 1997). Additionally, to the extent Oklahoma statutes place service of court process upon deputy sheriffs, it was the duty of the Sheriff to ensure that Cherry was properly trained prior to sending him out into the community to serve court process and/or that he was properly supervised while serving the same.

> In limited circumstances, a local government's decision not to train
> certain employees about their legal duty to avoid violating citizens' rights may
> rise to the level of an official government policy for purposes of § 1983. A
> municipality's culpability for a deprivation of rights is at its most tenuous
> where a claim turns on a failure to train. See *Oklahoma City v. Tuttle*, 471

U.S. 808, 822-823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton*, 489 U.S., at 388, 109 S.Ct. 1197. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.*, at 389, 109 S.Ct. 1197.

*Connick v. Thompson*, — U.S. —, 131 S.Ct. 1350, 1359-1360, 179 L.Ed.2d 417 (2011).

Based upon the undisputed facts that Sheriff provided no directives or training whatsoever to Cherry and has never supervised court compliance officers commissioned by him, this Court finds the decision not to train and/or supervise court compliance officers, is the official "policy" of Seminole County. It is, therefore, a question of fact for the jury whether the failure to train and/or supervise a deputy who carries a lethal weapon in the course of his duties evidences "deliberate indifference" to the rights of the citizens of Seminole County. Furthermore, it is also a question of fact for a jury whether this policy "caused" the death of Aaron Palmer. Accordingly, Defendant Sheriff's motion for summary judgment in his official capacity is **denied**.

*b. Individual capacity claims*

Title 42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws,

shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Title 42 U.S.C. § 1983 provides a federal remedy against any person who, acting under color of state law, deprives another of his federal rights. *Conn v. Gabbert*, 526 U.S. 286, 290, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999). Two prima facie elements must be alleged in a 1983 complaint: 1) the defendant deprived the plaintiff of a right secured by the 'Constitution and laws' of the United States and 2) the defendant acted 'under color of law.' *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 399 (1970). It is undisputed that the Sheriff was not present when Cherry burst into the house on Killingsworth and shot Aaron Palmer. Attocknie alleges instead that the Sheriff is personally and individually liable for having failed to train or supervise Cherry regarding the execution of a bench warrant or the use of force and that those failures caused the Sheriff to violate Plaintiff's constitutional rights.

Sheriff claims he can not be held liable under § 1983 because he did not personally participate in the deprivations of Plaintiff's constitutional rights. To establish individual liability of a supervisor for failure to train or supervise, "a plaintiff must show that '(1) the supervisor either failed to supervise or train the subordinate official; (2) a casual link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'" *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 381-82 (5th Cir. 2005). While it is true the Sheriff was not present at the scene where the shooting occurred, he did personally decide not to train and/or

supervise one of his deputies[4] and there clearly is a casual link between the failure to train

Cherry and the violation of plaintiff's constitutional rights. Thus, the only question for this

Court to decide is whether the Sheriff's inaction, *i.e.* his failure to train and/or supervise one

of his deputies, evidences "deliberate indifference" to the plaintiff's constitutional rights.

> " '[D]eliberate indifference' is a stringent standard of fault, requiring proof
> that a municipal actor disregarded a known or obvious consequence of his
> action." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382,
> 137 L.Ed.2d 626 (1997). Deliberate indifference can be satisfied by evidence
> showing that the defendant "knowingly created a substantial risk of
> constitutional injury." *Dodds*, 614 F.3d at 1206. "[A] local government
> policymaker is deliberately indifferent when he deliberately or consciously
> fails to act when presented with an obvious risk of constitutional harm which
> will almost inevitably result in constitutional injury of the type experienced by
> the plaintiff." *Hollingsworth v. Hill*, 110 F.3d 733, 745 (10th Cir.1997)
> (internal quotation marks omitted).

*Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 769 (10th Cir. 2013). Based

upon the facts alleged in Plaintiff's Second Amended Complaint, this Court finds it is a

question of fact for the jury as to whether the Sheriff was "deliberately indifferent" to the

plaintiff's constitutional right to be secure in his own house against unreasonable searches

and seizures. Accordingly, Defendant Shannon Smith's motion for summary judgment in

his individual capacity is **denied**.

---

[4]Although Sheriff maintains he was not the "supervisor" of Cherry, Oklahoma statutes placed the responsibility for supervision upon the Sheriff. *See*, OKLA. STAT., tit. 19, §§ 545 and 547(A).

### III.  Motion for Summary Judgment by Defendant Cherry

*a. § 1983 claims*

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 473, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980).  Police are prohibited, by the Fourth Amendment, from "effectuating a warrantless and non-consensual entry into a suspect's home to make a routine felony arrest." *Howard v. Dickerson*, 34 F.3d 978, 982 (10th Cir. 1994) (citing *Payton*, 445 U.S. at 576, 100 S.Ct. at 1375).  Absent exigent circumstances, even an arrest warrant does not give police the authority to enter any dwelling in search of the object of the warrant.  Rather, an arrest warrant only permits entry into the suspect's residence to effectuate an arrest.  Entry into a third party's home to effectuate the arrest of the person named on an arrest warrant requires a search warrant. *Mascorro v. Billings*, 656 F.3d 1198, 1205 (10th Cir. 2011).

A well-recognized exception to the warrant requirement applies when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); see also *Payton, supra*, at 590, 100 S.Ct. 1371 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant")." *Kentucky v. King*, — U.S. —, 131 S.Ct. 1849, 1856, 179 L.Ed.2d 865 (2011).  One exigency which

may justify a warrantless search of a home is when police officers are in hot pursuit of a fleeing suspect. *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.2d 300 (1976).

Cherry argues he should be given qualified immunity for entering Aaron Palmer's home without a search warrant. In an effort to circumvent the need for a search warrant, Cherry argues he was "in hot pursuit," citing *Stanton v. Simms*, — U.S. —, 134 S.Ct. 3, 187 L.Ed.2d 341 (2013). In *Stanton*, a police officer with probable cause to arrest a suspect for a misdemeanor kicked open a third party's front gate while in hot pursuit of the suspect. *Id.*, 134 S.Ct. at 4. The Supreme Court held the officer was entitled to qualified immunity because the law as to the warrantless entry during hot pursuit was not clearly established and the officer was not "plainly incompetent" in his interpretation of the law. *Id.*, at p. 5.

Whether or not Cherry was in "hot pursuit"[5] is a question of fact for the jury. The undisputed facts of this case indicate Randall Palmer had been at the residence earlier in the day. Cherry did not attempt to take Randall Palmer into custody at that time. Rather, he proceeded to the convenience store where he met with officers from the Seminole Police Department to develop a tactical plan. If, as Cherry claims, he had actually seen Randall Palmer run through the garage into the residence as he returned, it seems unlikely that Randall Palmer could have exited the residence without the other law enforcement officers observing him; however, this Court can not say it is impossible. Additionally, according to

---

[5] "Hot pursuit" involves an element of a chase. *Santana*, *supra*, 427 U.S. at 43, n. 3. See also, *Johnson v. United States*, 333 U.S. 10, 16 n7, 68 S.Ct. 367, 370, 92 L.Ed. 436 (1948).

Randall Palmer, he was not in the residence at the time the officers returned with the arrest warrant. The fact that the suspect's car may still have been parked outside near (but not directly in front of) the residence would not give an officer who just arrived on the scene any reason to believe that Randall Palmer was currently inside the residence let alone provide exigent circumstances, by itself, to justify a warrantless, perhaps unannounced, entry into the residence.

Cherry spends a great deal of time arguing that where an officer reasonably believes his life is in danger, he is entitled to use deadly force. While that may be true, if Cherry had no exigent circumstances to justify entry into the residence, he had already violated Aaron Palmer's Fourth Amendment rights prior to the shooting. As a result, this Court finds questions of fact exist which preclude summary judgment on Plaintiff's § 1983 claims and his motion for summary judgment is **denied**.

### b. State Constitutional Claims

Art. 2, § 30 of the Oklahoma State Constitution also protects the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches or seizures. This constitutional provision provides a private cause of action for excessive force and unreasonable seizures notwithstanding the requirements/limitations of the Oklahoma Governmental Tort Claims Act. *Bosh v. Cherokee County Building Authority*, 305 P.3d 994 (Okla. 2013). The defense of qualified immunity does not apply to Plaintiff's state constitutional claims. *Eidson v. Owens*, 515 F.3d 1139, 1145 (10th Cir. 2008) (quoting

*Jenkins v. City of New York*, 478 F.3d 76, 86 (2nd Cir. 2007)).  Accordingly, Defendant Cherry's motion for summary judgment on the state constitutional claims is also **denied**.

### c. State Tort Claims

Finally, Cherry argues, as an employee of the State of Oklahoma,  he is immune from suit for state tort claims both individually and under the Eleventh Amendment.  This Court finds, however, that Cherry was not an employee of the State of Oklahoma.  Rather, Cherry was hired as a "deputy" by the Sheriff and, therefore, was an employee of Seminole County.

Pursuant to the Oklahoma Governmental Tort Claims Act "political subdivisions, and all of their employees acting within the scope of their employment, whether performing governmental or proprietary functions, shall be immune from liability for torts,"  OKLA. STAT. tit. 51, § 152.1(A), except as provided within the Act.  *Id*., at § 152.1(B).  Political subdivisions are not liable, however, if a loss or claim results from "execution or enforcement of the lawful orders of any court."  OKLA. STAT. tit. 51, § 155(3) (2004).[6]  To the extent Cherry was attempting to execute a lawfully issued bench warrant from the Seminole County District Court, this Court finds neither Seminole County nor Cherry in his individual capacity can be held liable for the state tort claims alleged herein.  Accordingly, Defendant Cherry's motion for summary judgment on the state tort claims is **granted**.

___

[6]This particular subsection of the Oklahoma Governmental Tort Claims Act has remained the same since at least 2004. The 2009 amendments to this section of the statute, however, were ruled unconstitutional in *Douglas v. Cox Retirement Properties, Inc*., 302 P.2d 789 (Okla. 2013) and the 2012 amendment did not become effective until after the shooting involved herein.  As a result, this Court finds the 2004 statute is the appropriate state statute applicable to the claims herein.

## CONCLUSION

For the reasons stated herein, Defendant Tammy Wall's Motion for Summary Judgment (Dkt. No. 110) is **granted** and this action is dismissed with prejudice against Defendant Wall; Defendant Tammy Wall's Motion to Dismiss (Dkt. # 94) is **denied** as moot; Defendant Sheriff Shannon Smith's Motion for Summary Judgment (Dkt. No. 108) is **denied**; and Defendant Kenneth Cherry's Motion for Summary Judgment (Dkt. No. 107) is **denied** as to both federal and state constitutional claims and is **granted** as to all state tort claims.

It is so ordered on this  11th  day of July, 2014.


James H. Payne
United States District Judge
Eastern District of Oklahoma